IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


ONEIL SMITH,
ALIEN # A96-209-373,

      **Petitioner,**

**vs.**                     **Case Number 4:06cv576-WS/WCS**

ALBERTO GONZALES,
MICHAEL CHERTOFF,
MICHAEL ROZOS,
DAVID WING, DAVID HARVEY,
and the DEPARTMENT OF
HOMELAND SECURITY

      **Respondents.**

_____/


## REPORT AND RECOMMENDATION

      This case was initiated on December 20, 2006, with the submission of a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241.  Doc. 1.  Petitioner, who is *pro se* in this case, asserted he was a native and citizen of Jamaica, but that Jamaica refuses to issue travel documents for him.  *Id.*  Petitioner has been in the United States since February of 1980.  *Id.*, at 2.  At the time of filing, Petitioner alleged having been in detention pending removal since March 1, 2006, which at this point, is just over one year and seven months.  *Id.*, at 1.  Respondents filed an Answer on March 2, 2007.

Doc. 13.  On March 30, 2007, Petitioner filed his Reply.  Doc. 16.  Since that time,

Petitioner has also filed two notices of having submitted additional evidence.  Docs. 22

and 23.

**Claim of the § 2241 petition**

Petitioner seeks release from what is claimed to be an indefinite period of

custody.  Doc. 1.  Petitioner does not challenge the final order of removal.  Rather,

Petitioner alleges he has been held beyond the presumptively reasonable period of

detention as established by Zadvydas v. Davis, 533 U.S. 678 (2001), and asserts his

entitlement to release.

**Background Facts and Evidence**

Petitioner was born in Jamaica on May 2, 1978.  Doc. 1, p. 3.  Petitioner asserts

he entered the United States in February of 1980.  *Id.*  Respondents submit that

"Petitioner entered the United States through an unknown port of entry without

inspection or admission at an unknown date."  Doc. 13, p. 2.  Furthermore,

Respondents have submitted evidence that when Petitioner was interviewed by a

Deportation Officer in December of 2004, Petitioner claimed to have "entered the United

States using a non-immigrant visa in New York, NY in 1999 . . . . "  Ex. 1, p. 2 (doc. 13-

2, p. 3).[1]  The Officer was unable to verify Petitioner's claim regarding his entry.  *Id.*

---

[1] Hereafter, all references to exhibits are to those attached to document 13, unless otherwise noted.  References are to the paper copy and page number, followed by references (in parentheses) to the corresponding document and page in the electronic docket.  Both citations are referenced as a pro se litigant will not have access to the court's electronic docket.

Petitioner was processed as an alien found in the United States without inspection or admission and also removable because he had been convicted of an aggravated felony pursuant to 8 U.S.C. § 1101(a)(43)(E).  Doc. 13, p. 3; Ex. 1, p. 2 (doc. 13-2, p. 3).[2]  It is undisputed that Petitioner is not a citizen or national of the United States.  Doc. 13, p. 6; Ex. 1, p. 2 (doc. 13-2, p. 3); Doc. 1, p. 2; Doc. 16, p. 3.

In January of 2005, removal proceedings were initiated and Petitioner was interviewed by Deportation Officer Sabins and provided a sworn statement.  Doc. 13, p. 4; Ex. 1, p. 2 (doc. 13-2, p. 3).  During the interview, Petitioner was "uncooperative and constantly changed his story."  Ex. 1, p. 5 (doc. 13-2, p. 4).  First, he claimed he was born in New York City, later claiming to have been born in Kingston, Jamaica.  Ex. 1, p. 5 (doc. 13-2, p. 4).  Petitioner also claimed to have been born on May 2, 1971, then changed the date to 1978.  Ex. 1, p. 5 (doc. 13-2, p. 4).  Petitioner reported that his father, Arnold Smith, was deceased and Petitioner said that he came into the United States using a visa.  Ex. 1, p. 5 (doc. 13-2, p. 4).  Petitioner later admitted that he entered the United States illegally.  Ex. 1, p. 5 (doc. 13-2, p. 4).

On January 28, 2005, Petitioner was issued an Administrative Order of Removal by the Institution Removal Director.  Doc. 13, p. 4; Ex. 1, p. 4 (doc. 13-2, p. 5). Petitioner was ordered to be removed from the United States back to Jamaica.  Ex. 1, p.

---

[2] It is unnecessary to outline Petitioner's criminal history as his criminal convictions are undisputed and he is not able to challenge the basis for his Order of Removal in this petition as this Court lacks jurisdiction over such a challenge.  *See* Ex.. 1, p. 3 (doc. 13-2, p. 4); doc. 13, pp. 2-3.

4 (doc. 13-2, p. 5); Ex. B.  A warrant of removal was issued on February 3, 2005.  Doc. 13, p. 4; Ex. 1, p. 4 (doc. 13-2, p. 5); Ex. C.

Petitioner entered ICE's custody on March 1, 2006, at the Palm Beach County Jail.  Doc. 13, p. 4; Ex. 1 (doc. 13-2, p. 6).  Petitioner was then transferred to the KROME Processing Center.  Ex. 1, p. 5 (doc. 13-2, p. 6).  The first request for a travel document for Petitioner was made to the Consulate General of Jamaica on March 10, 2006.  Doc. 13, p. 4; Ex. 1 (doc. 13-2, p. 6).

On April 5, 2006, Petitioner was served an I-229(a) notice, and advised to cooperate with ICE.  Doc. 13, p. 4; Ex. 1 (doc. 13-2, p. 6); Ex. E.  Petitioner was also informed of § 243(a)'s requirements to assist in removal efforts and not act to hamper or prevent removal.  Ex. 1, p. 5 (doc. 13-2, p. 6); Ex. E.  Petitioner was provided with the Instruction Sheet which listed requirements that Petitioner must provide within 30 days. Ex. 1, p. 5 (doc. 13-2, p. 6); Ex. E.  Specifically, Petitioner was requested to provide a copy of his birth certificate and passport by May 5, 2006.  Ex. 1, p. 5 (doc. 13-2, p. 6); Ex. E.  On that same day, a second formal request was made to the Jamaican Consulate for a travel document.  Doc. 13, p. 4; Ex. 1, p. 5. (doc. 13-2, p. 6); Ex. F. Additionally, Doctor Cadavid with "Public Health Services/Immigration Services" was sent an e-mail message concerning Petitioner's depression and suicidal ideations.  Ex. 1, p. 5-6 (doc. 13-2, pp. 6-7); Ex. F.  Petitioner was interviewed by Deportation Officer Moreno and he kept changing his stories.  Ex. 1, p. 6 (doc. 13-2, p. 7); Ex. F.

Petitioner was interviewed by the Consulate General of Jamaica, Mr. Vance Carter, on April 20, 2006.  Doc. 13, p. 4; Ex. 1, p. 6 (doc. 13-2, p. 7).  Petitioner was

requested to provide more information, including his birth certificate, passport, school records, names and telephone numbers of his family members, and the like.  Doc. 13, p. 4; Ex. 1, p. 6 (doc. 13-2, p. 7); Ex. G.

On May 17, 2006, Petitioner wrote a letter to the Consulate General of Jamaica in which he reported being a Jamaican citizen currently held in the Wakulla County Jail. Ex. 1, p. 6 (doc. 13-2, p. 7).  Petitioner requested a travel document so he could be sent back to Jamaica and provided his name, date of birth (5-2-1978) in "Jamaica, St. Catherine," and identified his parents as Vinnette Smith (mother) and Ornel Smith (father).  Doc. 13, p. 5; Ex. 1, p. 6 (doc. 13-2, p. 7); Ex. H.

On May 19, 2006, Petitioner was served with a "Notice of Failure to Comply" because he failed to produce his birth certificate and passport as required.  Doc. 13, p. 5; Ex. 1, p. 6 (doc. 13-2, p. 7); Ex. I.  Petitioner was again directed to provide a copy of his birth certificate, which he failed to do.  Ex. 1, p. 6 (doc. 13-2, p. 7); Ex. I.  On this same day, ICE made a third formal request from the Consulate General of Jamaica for a travel document for Petitioner.  Doc. 13, p. 5; Ex. 1, p. 7 (doc. 13-2, p. 8); Ex. J.  The Consulate General had a second interview with Petitioner and the Consulate General told Petitioner he needed proof of his citizenship.  Doc. 13, p. 5; Ex. 1, p. 7 (doc. 13-2, p. 8); Ex. J.  Petitioner was again requested for names, addresses, and telephone numbers of his family members.  Doc. 13, p. 5; Ex. 1, p. 7 (doc. 13-2, p. 8); Ex. J.

Petitioner wrote a letter to the ICE Headquarters in Washington, D.C. on July 1, 2006.  Ex. 1, p. 7 (doc. 13-2, p. 8); Ex. L.  In this letter, Petitioner states that he is "a citizen of Jamaica" and requests that he be released under an order of supervision.  Ex.

L (doc. 13-3, p. 26).  He contends that he is not a danger to public safety nor a flight

risk.  *Id.*  He identified a friend in Boca Raton, Florida, who would allow him to live there.

Ex. L (doc. 13-3, p. 28).  Petitioner states that he entered the United States on February

20, 1980, and has been here for twenty-six years.  Ex. L (doc. 13-3, pp. 26-27).  He

reports having "family members in the United States" and said he would comply with all

restrictions imposed upon him as part of his supervised release.  Ex. L (doc. 13-3, p.

28).  He states that he has "cooperated in full with the INS to remove [him] from the

United States."  Ex. L (doc. 13-3, p. 28).  He reports that he signed his travel papers

and has cooperated with his Consulate General from Miami.  Ex. L (doc. 13-3, p. 29).

Petitioner then reported that his country would not accept his "deportation because they

claim [they] need a birth certificate and passport proving who I am."  *Id.*  He then wrote,

"they don't want to accept me because they say I'm not a citizen of Jamaica, which is

true I don't have either [referring to the lack of birth certificate and passport]."  *Id.*

Petitioner wrote another letter to Headquarter's in Washington on July 24, 2006.

Ex. L (doc. 13-3, p. 37).  He again re-asserted that he was "a native citizen of Jamaica,"

and requested that INS review his case.  *Id.*  Petitioner also reiterated that he entered

the United States on February 20, 1980, and has been here for since he was two years

of age.  Ex. L (doc. 13-3, p. 38).  He stated that he "had no knowledge of where or who,

was bringg [sic] me, or taking me."  *Id.*  He said that he had "no say of [his] own [as he]

was a child."  *Id.*  He reported having family and friends who would help him get started

in life and become more productive.  Ex. L (doc. 13-3, pp. 38-39).  He then stated he

would "be residing with family at the following address" and then identified Mr. Adam

Karachi in Boca Raton, the same individual he identified in his prior letter as a friend.

Ex. L (doc. 13-3, p. 39); *cf.* ex. L (doc. 13-3, p. 28).  Additionally, in the post order

custody review which took place in August, 2006, Petitioner again indicated this person

(name listed on this document as "Adam Kararachi") was a "friend."  Ex. P (doc. 13-4, p.

13).

On August 2, 2006, ICE made a fourth request to the Consulate General of

Jamaica seeking a travel document for Petitioner.  Doc. 13, p. 5; Ex. 1, p. 9 (doc. 13-2,

p. 10); Ex. N (doc. 13-4, p. 2).  Petitioner refused to provide his personal information to

the Consulate General of Jamaica.  Doc. 13, p. 5; Ex. 1 (doc. 13-2, p. 10); Ex. N.  The

following day, August 3rd, Petitioner was served with another I-229(a) form and again

directed to provide a copy of his birth certificate and his passport.  Doc. 13, p. 5; Ex. 1

(doc. 13-2, p. 10); Ex. O.  The I-229(a) form again advised Petitioner of the requirement

that he "make timely application in good faith for travel of other document necessary" for

his removal and that he could be subject to further criminal proceedings if he hampered

or prevented his removal.  Ex. O (doc. 13-4, p. 6).  Petitioner signed the Instruction

Sheet acknowledging receipt with the I-229(a) form.  Ex. O (doc. 13-4, p. 7).  The

Instruction Sheet, notably, did not contain any checkmarks to indicate any documents or

information that Petitioner was to provide.  Ex. O (doc. 13-4, p. 7).

On August 7, 2006, a Post Order Custody Review was completed.  Doc. 13, p. 5-

6; Ex. 1 (doc. 13-2, p. 12); Ex. P (doc. 13-4, p. 9).  During this review, Petitioner was

requested to provide a verifiable list of family members and associates, both inside and

outside the United States for identification purposes.  Doc. 13, p. 6; Ex. 1 (doc. 13-2, p.

12); Ex. P (doc. 13-4, p. 11).  The notation during the interview reveals that Petitioner

was "vague with his answers and clouding his identity."  Ex. P (doc. 13-4, p. 11).  For

example, Petitioner told the Consulate General of Jamaica that he came into the United

States when he "was only 2 years old."  *Id.*  However, he gave a statement to prison

officials and said he came into the United States in 1999 and had "spent most of his life

in Jamaica."  *Id.*

Indeed the custody review noted that in Petitioner's "pre-sentence investigation

report," he stated that between "1995-1999 he was self-employed in construction,

working different jobs in Jamaica, but mainly cement and roofing jobs . . . ."  Ex. P (doc.

13-4, p. 13).  Furthermore, he "claimed he attended school at Crescent All Age School

in Jamaica until he dropped out in the tenth grade."  *Id.*

The Consulate General of Jamaica concluded the Petitioner's identity could not

be confirmed due to the lack of verifiable information from Petitioner.  Doc. 13, p. 6; Ex.

1 (doc. 13-2, p. 12); Exhibits P, Q.  The Consulate General said that Petitioner had "to

provide more information."  Ex. P (doc. 13-4, p. 11).  Petitioner reports that "they have

everything."  *Id.*

Following the post order custody review, ICE decided to continue Petitioner's

detention.  Doc. 13, p. 6; Ex. 1 (doc. 13-2, p. 13); Ex. Q.  The recommendation by the

reviewing officer was that Petitioner's citizenship had "been obscured" and, therefore, a

travel document was not in the foreseeable future.  Ex. P (doc. 13-4, p. 15).  Petitioner

was notified by letter on August 13, 2006, that his detention would continue.  Doc. 13, p.

6; Ex. 1 (doc. 13-2, pp. 13-14); Ex. Q (doc. 13-4, p. 17).

On September 14, 2006, Petitioner was served another I-229(a) form and
advised of § 243(a)'s requirements to assist in removal efforts.  Doc. 13, p. 6; Ex. 1
(doc. 13-2, p.15); Ex. S (doc. 13-4, p. 23).  Petitioner was also provided an Instruction
Sheet containing requirements for him to assist in removal.  Ex. S (doc. 13-4, p. 23).
This time, each box had a checkmark indicating the numerous items of pieces of
information Petitioner needed to provide.  *Id.*  Additionally, Petitioner was
simultaneously served with a letter from ICE which noted that on August 3, 2006, he
had provided ICE with "a list of names with only 3 family members."  Ex. S (doc. 13-4, p.
25).  He was directed to "provide ICE by September 18, 2006 a complete family tree (all
family members) including dates of birth, nationalities, addresses, and phone numbers
for such persons, whether in your country of nationality and/or citizenship or elsewhere,
and your past residences, schools attended, etc."  *Id.*  Petitioner was also required to
provide ICE with "a valid passport."  *Id.*

At this point, Petitioner provided some information concerning names and
addresses of certain persons.  Doc. 13, p. 6; Ex. 1 (doc. 13-2, p. 16); Ex. T (doc. 13-4,
p. 27).  This information was provided by ICE to the Jamaican Consulate on September
22nd, but the Consulate was unable to verify the information provided by Petitioner.
Doc. 13, p. 6; Ex. 1 (doc. 13-2, p. 16); Ex. T (doc. 13-4, p. 27).

On September 24, 2006, another travel document request was sent to the
Jamaican Consulate.  Ex. 1 (doc. 12-2, p. 16); Ex. U (doc. 13-5, p. 2).  The request
provided some new additional information about Petitioner which was obtained from
Petitioner's pre-sentencing report.  Ex. 1 (doc. 12-2, p. 16); Ex. U (doc. 13-5, pp. 2-3).

The information obtained reveals that Petitioner "left Jamaica in 1999, at the age of 21."

Ex. T (doc. 13-5, p. 2).  There was a good deal more information concerning the names

of his parents, Arnold and Vinnit Smith, and his seven siblings, several of whom still

reside in Jamaica.  Ex. T (doc. 13-5, p. 2).  It also provided information about a child

that Petitioner fathered, and that child's mother, who still reside in Jamaica.  *Id.*  There

was additional information concerning visits to the Hospital in Jamaica, the school he

attended until he dropped out in the tenth grade, and a 20-acre parcel of land owned by

Petitioner's father.  *Id.*, at 2-3.

On September 28, 2006, the Jamaican Consulate called to report that the list of

names and numbers provided by Petitioner "did not help."  Ex. 1 (doc. 13-16).  "All the

names submitted either did not know [Petitioner] or could not be verified.  *Id.*

On October 31, 2006, Petitioner was issued another "Notice of Failure to

Comply" for failing to comply with the request that he provide a family tree.  Ex. V (doc.

13-5, p. 7).  The Notice indicated Petitioner failed to comply because although he

submitted a family tree, he failed to include any information about his parents, grand-

parents, great-grand-parents, aunts, cousins, and siblings.  Ex. 1 (doc. 13-2, p. 16); Ex.

V (doc. 13-5, p. 7).  The Notice advised Petitioner that the Consulate of Jamaica had

contacted the references Petitioner provided, but "had no success in establishing

[Petitioner's] citizenship."  Ex. V (doc. 13-5, p. 7).

Attempts continued to be made by ICE to obtain a travel document for Petitioner.

Doc. 13, p. 6.  In particular, letters were sent to names and addresses provided by

Petitioner.  Ex. 1 (doc. 13-2, p. 17); Ex. W (doc. 13-5).  Of the nine persons sent letters,

not one responded to ICE and several addresses provided by Petitioner were not valid.

Ex. 1 (doc. 13-2, p. 17); Ex. W (doc. 13-5, pp. 9-31).  Petitioner was served another I-

229(a) form on November 18, 2006.  Ex. X (doc. 13-5, p. 33).  He was provided another

Instruction Sheet, again with every box of the sheet containing a checkmark indicating

the items Petitioner was to provide.  Ex. X (doc. 13-5, p. 34).  Petitioner was

simultaneously served with a letter advising that he was subject to criminal prosecution

for his failure to assist in his removal.  Ex. X (doc. 13-5, p. 35).  Petitioner was advised

that his failure to provide a family tree containing names, dates of birth, nationalities,

addresses, and phone numbers for his parents, grand-parents, siblings, cousins, and

the like was "a direct attempt to hamper [his] removal."  Ex X (doc. 13-5, p. 35).

This identical process occurred again on November 30, 2006, *see* Ex. Y (doc.

13-5, p. 37, *et seq.*).  At that time, Petitioner was also required to fill out a Biographic

Information form, a Jamaican Birth Certificate Application form, and an Application for a

Jamaican Passport, among other forms.  Ex. 1 (doc. 13-2, p. 19); ex. Z (doc. 13-5, p.

43, *et. seq.*).  Petitioner submitted the forms, but essentially provided no new

information except for an address for his parents.  Ex. 1 (doc. 13-2, p. 19); Ex. AA (doc.

13-6, pp. 2-9).  Petitioner also, confusingly, listed Ornel Smith as his father and his

grandfather.  Ex. AA (doc. 13-6, p. 3).  Additionally, his mother and his grandmother are

listed as Vinnette Smith.  *Id.*

On December 12, 2006, Petitioner was issued another Notice of Failure to

Comply.  Ex. BB (doc. 13-6, p. 11).  Once again, he was informed that because he had

failed to provide ICE with a family tree as directed, he was deemed to be preventing his removal from the United States.  Ex. BB (doc. 13-6, p. 11).

With the new address Petitioner provided for either his parents or grandparents, ICE sent a "request for information letter" to that address on January 23, 2007.  Ex. 1 (doc. 13-2, p. 20); Ex. CC (doc. 13-6, p. 13).  The address Petitioner provided was 9501 NW 18th Ct. in Sunrise, FL 33313.  Ex. CC (doc. 13-6, p. 2); *see also* Ex. FF (doc. 13-7, p. 11).  There was no response to the letter from Petitioner's grandparents.  Ex. 1 (doc. 13-2, p. 20).  ICE re-submitted another request for the issuance of travel document for Petitioner as well on January 23, 2007.  Ex. CC (doc. 13-6, p. 26).  After receiving no response, a second letter requesting information was sent to his parents or grandparents with a self-stamped, postage-paid envelope on February 13, 2007.  Ex. 1 (doc. 13-2, p. 21); *see* ex. FF (doc. 13-7, p. 11, *et. seq.*).  As of the time the Answer was filed on March 2, 2007, no response had been received.

Petitioner was served with another I-229(a) form on January 24, 2007.  Ex. 1 (doc. 13-2, p. 20).  He was again reminded of his obligation to assist in his removal and directed to provide the list of documents and information from the Instruction Sheet.  Ex. 1 (doc. 13-2, pp. 20-21); Ex. DD (doc. 13-7, p. 3).  Petitioner was also read his Miranda rights and served a Notice of Litigation letter.  Ex. 1 (doc. 13-2, p. 21); Ex. DD (doc. 13-7, pp. 5-6).

These efforts have been unsuccessful.  Respondents have deemed Petitioner as "a 'Failure to Comply' case" and determined that he has "concealed his identity."  Ex. 1 (doc. 13-2, p. 22).  Petitioner has not provided "any contact information for any of his

relatives." *Id.*  At the time Petitioner was involved in ths criminal proceedings, he provided a "sworn statement to his United States Probation Officer about his life in Jamaica, his son in Jamaica, the jobs he [had] held in Jamaica, his entry into the United States, and his family." *Id.*  However, Petitioner has "constantly changed his story and has been uncooperative with ICE and with the Jamaican Consulate." *Id.*  Respondents now suggest that they are uncertain "of his citizenship at this time." *Id.*

**Petitioner's Reply, doc. 16**

Petitioner filed his reply on March 30, 2007.  Doc. 16.  While Petitioner argues points of law and asserts the holding in Zadvydas, *supra*, he also argues that he could be released because he is not a flight risk.  Doc. 16.  Petitioner does not, however, address Respondent's argument that Petitioner is the cause for delay and the inability to obtain a travel document because Petitioner has not come forward with information relevant to substantiating his citizenship.  Petitioner also does not address Respondent's argument that Petitioner has provided conflicting information and statements between what he is now saying and what he previously reported during his criminal proceeding.

In July, 2007, Petitioner filed a notice of the submission of additional evidence. Doc. 22.[3]  That notice, provided, without any explanation, a one-page document titled as "Adopted Children Register."  Doc. 22, p. 3.  On the bottom of the document is a photocopy purporting to show that this one-page "register" came from an address in Sunrise, Florida.  *Id.*  In particular, the address is 5901 NW 18th Court in Sunrise.  *Id.*

---

[3] This notice was submitted again as document 23.

The number of the address previously provided by Petitioner, however, was 9501.

Moreover, review of a prior document Petitioner submitted shows that he lists Jamal

Watson, who is identified as "family" at the address: 5901 N.W. 18 Court in Sunrise,

Florida.  *See* Ex. U (doc. 13-5, p. 4).

Furthermore, the "register" indicates Petitioner was adopted on February 27,

1980, in Jamaica.  Doc. 22, p. 3.  It also shows a birthday for Petitioner as May 21,

1978, Jamaica.  *Id.*  Petitioner on the other hand, has been reporting his birthday as

May 2, 1978.  *See* Ex. AA, pp. 2, 3, 4.  The postal stamp on this document indicates the

envelope was mailed on June 27, 2007.  Doc. 22, p. 3.

**Analysis**

Because Petitioner is not challenging a final order of removal, but only seeking

release from detention pursuant to Zadvydas v. Davis, 533 U.S. 678, 121 S.Ct. 2491,

150 L.Ed.2d 653 (2001), this Court has jurisdiction over this § 2241 habeas petition.  In

Zadvydas, the United States Supreme Court considered a challenge to 8 U.S.C. §

1231(a)(6) and was asked to decide whether the statute authorized indefinite detention

of a removable alien.[4]  The Court held that the continued detention of legal permanent

aliens beyond the mandated 90-day removal period was permissible under the

Constitution, but only for as long as was "reasonably necessary to bring about that

alien's removal from the United States."  *Id.*, at 689, 121 S. Ct. at 2498.  The Court

concluded that "once removal is no longer reasonably foreseeable, continued detention

---

[4] Section 1231(a)(1)(A) provides that the government has a 90-day "removal period" to remove an alien ordered removed from the United States.  8 U.S.C. § 1231(a)(1)(A).

is no longer authorized by statute." *Id.,* at 699, 121 S.Ct. at 2503.  For sake of

uniformity, the Court announced "the presumptive period during which the detention of

an alien is reasonably necessary to effectuate his removal is six months; after that, the

alien is eligible for conditional release if he can demonstrate that there is 'no significant

likelihood of removal in the reasonably foreseeable future.' "  Clark v. Martinez, 543 U.S.

371, 125 S.Ct. 716, 722, 160 L.Ed.2d 734 (2005), *quoting* Zadvydas, 533 U.S. at 701,

121 S.Ct. at 2505.

In Clark v. Martinez, *supra*, the Court extended its interpretation of 8 U.S.C. §

1231(a)(6) to inadmissible aliens,[5] concluding there was no reason why the removal

period would be longer for an inadmissible alien than an admissible alien.  Clark, 543

U.S. at 386, 125 S.Ct. at 727.  Thus, the 6-month presumptive detention period

prescribed in Zadvydas is applicable regardless of the alien's status.  *Id.*  Accordingly,

under Clark and Zadvydas, when an alien shows that he has been held more than six

months beyond the removal period and his removal is not reasonably foreseeable, a §

2241 petition should be granted.  Clark, 543 U.S. at 386-387, 125 S.Ct. at 727; Benitez

v. Wallis, 402 F.3d 1133, 1135 (11th Cir. 2005) (relying on Clark to hold that "an

inadmissible alien can no longer be detained beyond the statutory 90-day removal

---

[5] The relevant statute provides: "An alien ordered removed who is inadmissible
under section 1182 of this title, removable [for violations of nonimmigrant status or entry
conditions, violations of criminal laws, or threatening national security] or who has been
determined by the Attorney General to be a risk to the community or unlikely to comply
with the order of removal, may be detained beyond the removal period and, if released,
shall be subject to the terms of supervision in paragraph (3)."  8 U.S.C. § 1231(a)(6),
*quoted in* Benitez v. Wallis, 402 F.3d 1133, 1134 (11th Cir. 2005).

period of § 1231(a)(1), where there was no significant likelihood of removal in the reasonable foreseeable future.").

An exception to the six-month removal period exists under 8 U.S.C. § 1231(a)(1) which provides that the removal period "shall be extended . . . and the alien may remain in detention during such extended period if the alien fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure or conspires or acts to prevent the alien's removal subject to an order of removal."  8 U.S.C. § 1231(a)(1)(C).[6]  Accordingly, where the alien acts or conspires to prevent his removal, an extended period of detention is expressly permitted by statute.  Thus, in considering whether there appears to be no significant likelihood of Petitioner's removal in the reasonably foreseeable future, the Court must consider whether Petitioner's removal has been delayed or extended by Petitioner's own efforts.

In Sango-Dema v. District Director, I.N.S., 122 F.Supp.2d 213 (D. Mass. 2000), a case decided before Zadvydas, the court denied habeas relief where the petitioner was found to be "the cause for the long delay."  The court stated, "[e]ven if this Court were to agree with the courts recognizing a constitutional right to be free from indefinite detention by the INS, an alien cannot trigger such a right with his outright refusal to cooperate with INS officials."  Sango-Dema, 122 F.Supp.2d at 221.

In Powell v. Ashcroft, 194 F.Supp.2d 209 (E.D.N.Y. 2002), the court noted that Zadvydas was concerned with the constitutionality of § 1231(a)(6) where aliens were in

---

[6] During the "removal period" an alien must be detained.  8 U.S.C. § 1231(a)(2). Petitioner's removal period began on January 24, 2004, the date on which he entered into ICE's custody.  8 U.S.C. § 1231(a)(1)(B).

" ''deportation limbo because their countries of origin had refused to allow [them] entrance.' " Powell, 194 F.Supp.2d at 211, *citing* Sango-Dema, 122 F.Supp.2d at 221 (explaining Zadvydas).  The court found that Zadvydas was inapplicable because it "did not discuss the constitutionality of Section 1231(a)(1)(C) and the tolling of the removal period during the time of an alien's non-cooperation." Powell, 194 F.Supp.2d at 212, *citing* Guner v. Reno, 2001 WL 940576 (S.D.N.Y. Aug. 20, 2001).  The court held that petitioner's continued detention was appropriate because he had not "provide[d] accurate and complete information to the INS," and that after he did so, it was likely that he would be removed.  Powell, 194 F.Supp.2d at 212.  *See also* Archibald v. I.N.S., 2002 WL 1434391, *8 (E.D.Pa. July 1, 2002) (finding the case factually distinguishable from *Zadvydas* where "Archibald's detention [was] a direct result of his seeking relief from deportation" and holding that because his indefinite detention was a result of his requesting a stay, he could not "be heard to complain[] that the time period during which he has been detained constitute[d] a denial of due process."); Thevarajah v. McElroy, 2002 WL 923914 (E.D.N.Y. Apr. 30, 2002)(holding that petitioner's custody by INS was constitutional following *Zadvydas* because the nearly 5-year detention was lengthened largely because of petitioner's own actions); *cf.* Seretse-Khama v. Ashcroft, 215 F.Supp.2d 37 (D.D.C. July 22, 2002) (rejecting respondent's argument that petitioner "has not cooperated in obtaining travel documents because he told Liberian officials that he did not want to return to Liberia" and noting that INS had not argued that "petitioner refused to request travel documents or refused to be interviewed by Liberian officials"

and did not deny his Liberian citizenship, or give "false or misleading information that impeded the issuance of travel documents.").

Another persuasive case is Pelich v. I.N.S., 329 F.3d 1057 (9th Cir. 2003), in which the court found that petitioner's detention was "indefinite only because he refuse[d] to cooperate with the Immigration and Naturalization Service's ("INS") efforts to remove him." Pelich, 329 F.3d at 1057. In that circumstance, the court concluded that petitioner had "no cause to complain" and affirmed the denial of his § 2241 habeas petition. 329 F.3d at 1057-58.

In a case before the Eastern District of New York, the court set forth various situations which have been deemed to toll the removal period:

> Section 1231 states that if an alien acts to frustrate the INS' ability to remove him, the removal period is tolled during the period of the alien's actions. 8 U.S.C. § 1231(a)(1)(C); Powell v. Ashcroft, 194 F.Supp.2d 209, 210 (E.D.N.Y. 2002). The limited case law on what constitutes a "frustration of removal" has not interpreted this phrase expansively: courts have only tolled the removal period in cases where the alien has sought and received a stay of removal through judicial action (see Akinwale v. Ashcroft, 287 F.3d 1050, 1052 (11th Cir. 2002)), or where the alien has demonstrated some sort of bad faith failure to cooperate, such as providing the INS with false or inconsistent information regarding his identity or country of origin (see Powell, supra; Ncube v. INS, No. 98 Civ. 0282, 1998 WL 842349 at *16 (S.D.N.Y. Dec. 2, 1998)), or refusing to complete travel arrangements or name a country for deportation (Riley v. Greene, 149 F.Supp.2d 1256, 1262 (D.Colo. 2001); Sango-Dema v. District Director, 122 F.Supp.2d 213, 221 (D.Mass. 2000); Cf. Ford v. Quarantillo, 142 F.Supp.2d 585, 588 (D.N.J. 2001) (ordering release of alien detained for 14 months, even though he misrepresented his country of origin)). Indeed, as Seretse-Khama has held, a petitioner's truthful statement (such as expressing that he did not wish to return to his country of origin) which is later adopted by the country of origin as a reason for not wanting to repatriate that alien, is not an example of refusal to cooperate under § 1231(a)(1)(C), and cannot be used as a grounds for extending

post-removal detention.  Seretse-Khama v. Ashcroft, 215 F.Supp.2d 37,
50-53 (D.D.C. 2002).

Rajigah v. Conway, 268 F.Supp.2d 159, 165 (E.D.N.Y., 2003)(relying on the decision

from Powell v. Ashcroft, supra).  Ultimately, the court in Rajigah concluded that the

petitioner had not acted in bad faith simply because he requested a stay of removal and

"availed himself of judicial process and communicated to the Guyanese embassy his

plans to" file an action in court.  268 F.Supp.2d at 166[7]

       Cited in Rajigah is Seretse-Khama v. Ashcroft, 215 F.Supp.2d 37 (D.D.C. 2002).

There, the court determined that simply because an alien tells the Consul of his country

of citizenship that he did not want to return, he is not hindering his removal.  215

F.Supp.2d at 51.  The court noted that the petitioner had not " refused to request travel

documents or refused to be interviewed by Liberian officials."  Id.  No claims were

before the court that the petitioner had denied his citizenship, "gave false or misleading

information that impeded the issuance of travel documents."  Id.  Petitioner truthfully

answered the Consul's questions during an interview, but simply and "honestly told the

Consul that he did not want to return to Liberia in light of his lack of family in or ties to

_____

       [7] Somewhat contrary to the Rajigah decision, though, is Akinwale v. Ashcroft, 287
F.3d 1050 (11th Cir. 2002).  There, the petitioner was taken into custody by Immigration
officials following release from incarceration.  287 F.3d at 1051.  He filed a habeas
petition just four months into his detention, asserting he "was being indefinitely detained
. . . ."  Id.  The petition was denied based on a finding that the petitioner had not
presented "a situation involving prolonged or indefinite detention pending removal."  Id.
In approving the dismissal of the case, the Eleventh Circuit Court of Appeals concluded
that a four-month period of detention was not "prolonged" pursuant to Zadvydas, and,
furthermore, the petitioner had not shown the unlikeliness of his removal in the
foreseeable future. Id., at 1051-52.  In a footnote, the Eleventh Circuit noted that
Akinwale's filing of the stay of deportation "interrupted the running of time under
Zadvydas" and acted to extend his own removal period.  Id., at 1052, n.4.

Liberia, which he left . . . when he was only eight years old."  *Id.*  The court concluded

that such a statement without more did not amount to a "bad faith failure to cooperate."

*Id.*[8]

In this case, Petitioner's six-month period of removal pursuant to <u>Zadvydas</u> has

been tolled as permitted by 8 U.S.C. § 1231(a)(1)(C).   In other words, the period of time

by which Petitioner has been non-cooperative has tolled the six month period of time for

removal as announced in <u>Zadvydas</u>.  *See* <u>Francois v. Chertoff</u>, 2006 WL 2668193, *3

(D.N.J., 2006)(citations omitted); 8 U.S.C. § 1231(a)(1)(C).

On numerous occasions, Petitioner was issued Instruction Sheets requiring his

assistance in establishing his identification and citizenship.  Petitioner was asked to

---

[8] In a footnote, the court surveyed the case law on the issue of what "constitutes an affirmative act that prevents one's return" or removal:

> Furthermore, most of the case law was decided before the Court's ruling in <u>Zadvydas</u>.  *See, e.g.*, <u>Bini v. Aljets</u>, 2002 WL 535083, 36 Fed.Appx. 868 (8th Cir. 2002) (alien who obtained stay of proceedings in district court prevented his removal); <u>Powell v. Ashcroft</u>, 194 F.Supp.2d 209, 210-211 (E.D.N.Y. 2002) (alien who claimed in four affidavits that he was from U.S. Virgin Islands, Jamaica, Trinidad, and Canada, and provided false name and false date of entry, prevented his removal); <u>Riley v. Greene</u>, 149 F.Supp.2d 1256, 1262 (D.Colo. 2001) (alien who admitted he refused to complete travel arrangements and refused to name any country for deportation); <u>Sango-Dema v. District Director</u>, 122 F.Supp.2d 213, 221 (D.Mass. 2000) (alien who refused to provide passport and birth certificate, and refused to communicate with embassy officials or complete application for documents); <u>Ncube v. INS</u>, 1998 WL 842349, *16 (S.D.N.Y. Dec. 2, 1998) (failing to provide INS with passport or proof of identification or nationality; many statements false or at least contradictory); *cf.* <u>Ford v. Quarantillo</u>, 142 F.Supp.2d 585, 588 (D.N.J. 2001) (ordering release of alien detained for 14 months, even though he misrepresented his country of origin).

215 F.Supp.2d at 51, n.18.

provide basic family information, but he failed to do so.  Petitioner refuses to provide a

family tree and accurately provide immigration officials with names, addresses, and

relevant information.  Even the information Petitioner has provided has been conflicting.

For example, Petitioner has stated that he was born in Jamaica on May 2, 1978.

However, most recently he has submitted a document purporting to show he was

adopted and born on May 21, 1978.  Furthermore, there has been no prior discussion or

identification of Petitioner as having been adopted.

Additionally, Petitioner has identified his parents with different names.  At one

point, he lists his mother as Vinnette Smith and his father as Ornel Smith.  Ex. AA (doc.

13-6, p. 2); Ex. H (doc. 13-3, p. 10).  Then at another time, he identifies his parents as

Arnold Smith (father) and his mother as Vinnit Smith.  Ex. T (doc. 13-4, pp. 38, 39).  And

yet another time, their names are Oneil and Vinnette Smith.  *See* doc. 13-7, p. 11.

Petitioner does not identify his brothers or sisters, aunts or uncles, or grandparents.  He

provides no verifiable contact information for any of the persons he identifies as persons

who will help him get back on his feet should he be released.

Petitioner also has been providing two different stories about when and how he

came into the United States.  He has maintained that he came into the United States as

a two-year old child sometime in 1980.  However, in Petitioner's pre-sentence

investigation report, he reported that between 1995-1999 he was self-employed in

Jamaica, working different jobs in the construction field.  Ex. P (doc. 13-4, p. 13).

Furthermore, he "claimed he attended school at Crescent All Age School in Jamaica

until he dropped out in the tenth grade." *Id.* His failure to forthrightly acknowledge his past history and past residences has tolled the time for removal.

Petitioner has not come forward with any evidence to demonstrate that he has made positive efforts to assist in the removal process. Rather, Petitioner's efforts appear designed at confusing the effort and preventing his removal. Should Petitioner provide the relevant information which has been requested of him, it appears likely that his removal will take place. Indeed, Respondents have argued that "[h]istorically, U.S. government efforts to repatriate aliens to Jamaica have succeeded." Doc. 13, pp. 8-9. Respondents have shown that in 2004, "the last year for which statistics are available, the U.S. government has successfully repatriated aliens to Jamaica." *Id.*, at 9. Respondents have persuasively shown that when Petitioner provides information that can be verified or substantiated, his removal will be forthcoming.

Petitioner has thwarted his removal by providing inaccurate information and refusing to disclose the proper identity of family members. He has been providing conflicting stories, names, and dates. At such time as Petitioner wishes to assist in his removal, it is likely that he will be removed. Petitioner is responsible for the delay. Accordingly, Petitioner has acted to toll the removal period and his continued detention is lawful pursuant to 8 U.S.C. § 1231(a)(1). For these reasons, this § 2241 petition should be denied.

Accordingly, it is **RECOMMENDED** that the petition for a writ of habeas corpus, doc. 1, filed by Oneil David Smith, A96-209-373, pursuant to 28 U.S.C. § 2241, be **DENIED.**

**IN CHAMBERS** at Tallahassee, Florida, on October 25, 2007.


s/      William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**